**In re Bernard L. SCHUBERT, Debtor.**

Nos. 91 Civ. 5631 (PKL),
91 Civ. 5632 (PKL).

United States District Court,
S.D. New York.

July 16, 1992.

Ruth Peres, pro se.

Kane, Kessler, Proujansky, Tullman, Preiss & Nurnberg, P.C., New York City (Jeffrey A. Oppenheim, of counsel), for appellee and cross-appellant Halstead Property Co.

## ORDER AND OPINION

LEISURE, District Judge:

This is an appeal and cross-appeal from a decision of the United States Bankruptcy Court for the Southern District of New York (Blackshear, J.) dated May 14, 1991; an order entered thereon dated May 16, 1991; and an order dated July 1, 1991, denying the motion for reargument of appellee Ruth Peres ("Peres"). For the reasons stated below, the decision and orders of the Bankruptcy Court are affirmed in their entirety.

### Background

On February 7, 1986, Bernard Schubert ("Schubert") filed a voluntary petition pursuant to Chapter 11 of the United States Bankruptcy Code. Schubert owned a town-

house located at 118 East 65th Street, New York, New York (the "Townhouse"), which was to be sold pursuant to a plan of reorganization.

The Bankruptcy Court authorized the retention of appellee and cross-appellant Halstead Property Co. ("Halstead") as the exclusive broker and auctioneer for the Townhouse by order dated October 16, 1990 (the "retention order"). The retention order incorporated a letter agreement between Halstead and Schubert dated October 3, 1990 (the "October 3 letter"), which purported to give Halstead the "exclusive right to offer and sell" the Townhouse. The October 3 letter also stated:

> If during the Term, we [Halstead], you [Schubert], another broker, finder, or other person, finds a purchaser of the Premises, you agree to pay us the full commission set forth herein. This will include parties who may have been offered the property prior to the date of this agreement. We agree to actively cooperate with other brokers in the sale of your property and to split the 6% commission referred to above 50/50 in the case of local brokers and to pay a 20% referral fee out of the 6% commission in the case of non-local brokers.

October 3 letter, ¶¶ 1–2. Halstead also sent a mailing card[1] to more than 1,500 brokers, inviting them to cooperate with Halstead in finding a buyer for the Townhouse; Halstead indicated that it would share the 6% brokerage commission on a "50/50" basis. Prior to the retention of Halstead, Schubert attempted to sell the Townhouse on his own. During this time, certain individuals looked at the Townhouse; these individuals included Peres as well as Isaac Schinazi ("Schinazi"), who ultimately purchased the Townhouse for $2.535 million.

Under the terms of the retention order, a brokerage commission of $152,100 (6% of the $2.535 million purchase price) was to be paid in connection with the sale of the Townhouse to Schinazi. Peres contends that she is entitled to one-half of such brokerage commission (or $76,050) on the basis of an alleged oral agreement made on October 26, 1990 between Peres and George van der Ploeg ("van der Ploeg"), acting on behalf of Halstead, wherein Halstead agreed to split its brokerage commission with her if she produced a buyer for the Townhouse. Peres claims that she informed van der Ploeg that Schinazi was interested in the Townhouse, and that van der Ploeg agreed to split the brokerage commission with her in the event that Schinazi was the successful bidder at auction. Halstead disputes the existence of any such agreement and contends that it is entitled to the entire 6% brokerage commission.

The questions before the Bankruptcy Court were whether Peres and Halstead had entered into an agreement to split the brokerage commission, and, if so, whether Peres had satisfied her obligations under such agreement in order to be entitled to split the brokerage commission with Halstead. The Bankruptcy Court held an evidentiary hearing with respect to these issues on February 25, 1991. The Bankruptcy Court noted that the witnesses who testified at the evidentiary hearing presented conflicting versions of the events leading up to the sale of the Townhouse to Schinazi, and that "[t]he testimony presented in this case is not the most credible this Court has observed." Decision at 14.

Peres testified that she became aware of the Townhouse through Schubert's former secretary, Ella Weisner ("Weisner"). According to Peres, in early October 1990, Roger Ribacoff ("Ribacoff") introduced her

---

1. The mailing card stated in full:

AUCTION BY ORDER OF BANKRUPTCY COURT
CHAPTER 11—DEBTOR IN POSSESSION
November 28, 1990
Minimum Bid: $2,400,000
Full 6% Commission Split 50/50
118 EAST 65TH STREET
(between Park Avenue and Lexington Avenue)

5 Story Limestone Beaux–Arts Mansion with Elevator
20' ×x 100', built 60' with 4–story extension
DELIVERED VACANT
For Details and Appointments call Exclusive Agent
George van der Ploeg, 734–0010 × x 218
The Halstead Property Company
1065 Madison Avenue, New York, N.Y. 10028

to Schinazi as a possible purchaser for the Townhouse. On October 9, 1990, Peres, Schinazi, and Schinazi's father visited the Townhouse. On October 17, 1990, Peres and Ribacoff met with Schubert, at which time Peres made an offer to purchase the Townhouse on behalf of Schinazi; Schubert, however, rejected the offer as insufficient. On October 25, 1990, Schubert informed Peres that he had entered into an exclusive brokerage agreement with Halstead and that if Schinazi still had an interest in purchasing the Townhouse, Peres should speak with Halstead.

Peres further testified that on October 26, 1990, she spoke with van der Ploeg of Halstead regarding Schinazi's interest in purchasing the Townhouse, and that van der Ploeg agreed to split the brokerage commission "50/50" with her if Schinazi purchased the Townhouse. Peres acknowledged that she never entered into a written agreement with Halstead, nor did she document her conversation with van der Ploeg in any way, such as in a follow-up letter; indeed, Peres did not speak with van der Ploeg again until January 4, 1991, after a failed auction of the Townhouse on November 28, 1990 [2] but before the January 8, 1991 auction of the Townhouse at which Schinazi was the successful bidder.

The testimony of other witnesses contradicted that of Peres. For example, van der Ploeg testified that during the October 26, 1990 telephone conversation with Peres, he and Peres discussed the upcoming November auction of the Townhouse, but Peres did not ask him to split Halstead's brokerage commission with her and he did not agree to split the brokerage commission with her should the individual whom she represented purchase the Townhouse. Van der Ploeg further testified that Peres did not divulge Schinazi's identity to him dur-

ing the telephone conversation, and he was not aware that Peres was representing Schinazi until Peres telephoned him on January 4, 1991, and informed him that she expected one-half of the brokerage commission in the event that Schinazi was the successful bidder at the upcoming auction for the Townhouse.

The Bankruptcy Court concluded that Peres had failed to sustain her burden of proving the existence of an agreement with Halstead to split the brokerage commission in the event that Schinazi was the successful bidder at the auction for the Townhouse. The Bankruptcy Court first found that Peres had not proven the existence of an oral agreement to split the brokerage commission, whether envisaged as an agreement for Peres to act as a broker or a finder; the Bankruptcy Court found that "[t]he testimony presented directly on the point is contradictory, and the inferences to be drawn from circumstantial evidence are equally contradicted." Decision at 14. The Bankruptcy Court next found that Peres had not proven the existence of an agreement based upon a written offer as conveyed in the October 3 letter or the mailing card; the Bankruptcy Court concluded that the October 3 letter, to the extent that it constituted an offer to split the brokerage commission with another broker, "contemplated a more active role than that played by Peres after she became aware of it," Decision at 14, and that the mailing card appeared to be merely an "enticement to enter into an agreement" as opposed to "an offer to enter into a unilateral contract whereby performance would equal acceptance," Decision at 15. The Bankruptcy Court therefore denied Peres's motion to recover one-half of the $152,100 brokerage commission (or $76,050).

2. The successful bidder at the November 28, 1990 auction—an individual named Noorani—apparently was unable to consummate the transaction and purchase the Townhouse. Schinazi subsequently moved, by Order to Show Cause, for an order directing Schubert to sell the Townhouse to Schinazi for $1.6 million, representing the last bid that Schinazi had made at the auction before he became involved in a $100,000-by-$100,000 bidding contest with

Noorani. The affidavits submitted alleged that Noorani was a "plant" by Halstead to drive up the price of the Townhouse, and that Noorani was not a "serious" bidder. The Bankruptcy Court in effect nullified the November 28, 1990 auction, and at a subsequent auction held on January 8, 1991, Schinazi was the successful bidder for the Townhouse with his bid of $2.535 million. Decision at 6 n. 1.

The Bankruptcy Court was nonetheless "troubled" because it was "convinced that Peres played a significant role in Schinazi's eventual purchase of the [Townhouse], which, as an end result, is a large benefit to the bankrupt estate," and that "[c]onversely, Halstead played a minimal role, if any, in Schinazi's purchase of the House." Decision at 15. The Bankruptcy Court noted that a separate entity—the Azreal Corporation ("Azreal")—had, before the January 1991 auction, signed a contract with Schubert to purchase the Townhouse for $2.4 million.[3] The Bankruptcy Court further noted that Peres's efforts brought Schinazi to the January 1991 auction at which he made his ultimately successful bid of $2.535 million for the Townhouse, and that Schinazi's bid was $135,000 more than the bankrupt estate would have received had Azreal purchased the Townhouse for the $2.4 million contract price. Accordingly, the Bankruptcy Court exercised its discretion to modify the terms of the retention order that provided for Halstead's compensation: the Bankruptcy Court reduced Halstead's commission by $8,100, to $144,000, and awarded Peres $8,100; the $8,100 represented 6% of the additional funds that were brought into the estate when Schinazi purchased the Townhouse for $135,000 more than Azreal would have paid for the Townhouse under the contract that it had signed.

In her appeal, Peres contends that:

[T]he Bankruptcy Court was clearly in errot [sic] in it's [sic] finding that there was no agreement to share the commission 50/50 and failed to apply the correct legal standards and abused it's [sic] descretion [sic] in making it's [sic] award of $8,100.00 to Peres after a finding that her role in the sale of the House was "a large benefit to the estate", and $144,-000.00 to Halstead after a finding that Halstead made no effort to make the sale, and the decision should be reversed and/or modified.

Memorandum of Law at 2–3. In contrast, Halstead does not argue that the Bankruptcy Court's findings of fact are clearly erroneous. Halstead does, however, cross-appeal from the Bankruptcy Court's decision and order to the extent that the Bankruptcy Court exercised its equitable powers by reducing Halstead's brokerage commission by $8,100 and awarding $8,100 to Peres. Halstead argues on its cross-appeal that the Bankruptcy Court abused its discretion; that Halstead is entitled to a brokerage commission of $152,100, as provided for in the retention order; and that Peres is not entitled to any brokerage commission whatsoever.

## Discussion

### I.  Standard of Review

Bankruptcy Rule 8013 provides the applicable standard of review of the Bankruptcy Court's decision and orders:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

This Court "must accept the bankruptcy court's findings of fact unless clearly erroneous," and will reverse the Bankruptcy Court "only if [it is] left with the definite and firm conviction that a mistake has been committed." *In re Manville Forest Products Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (quotation omitted). At the same time, this Court reviews the Bankruptcy Court's conclusions of law *de novo. Id.*

### II.  Peres's Appeal

#### A.  *No Agreement to Split the Brokerage Commission*

■ Peres contends that the Bankruptcy Court's finding that she and Halstead did

---

**3.**  It appears that on December 19, 1990, after Azreal signed the contract with Schubert to purchase the Townhouse for $2.4 million, the Bankruptcy Court held a hearing, in part to consider whether to approve the contract. At the hearing, the Bankruptcy Court did not approve the contract, but rather scheduled the January 8, 1991 auction; at the auction, both Schinazi and Schubert submitted bids, and Schinazi was the successful bidder. Tr. at 57–59.

342

not enter into any agreement to split the brokerage commission is clearly erroneous. This Court disagrees with Peres's contention.

Peres had the burden of proving, by a preponderance of the evidence, her claim that she and van der Ploeg (on behalf of Halstead) had entered into an oral agreement whereby she and Halstead would split the brokerage commission in the event that Schinazi was the successful bidder at the auction for the Townhouse. At the evidentiary hearing, there was conflicting testimony as to whether Peres and van der Ploeg had reached such an oral agreement during their October 26, 1990 telephone conversation. Peres testified that they did reach such an agreement, while van der Ploeg testified that they did not. In addition, there was circumstantial evidence from which conflicting inferences could reasonably be drawn. On the one hand, Peres made no attempt to reduce the alleged oral agreement to writing or even to send a follow-up letter to Halstead—notwithstanding the fact that she is an attorney, and that she entered into the alleged agreement with a stranger for a potentially substantial sum of money—and she did not even communicate with Halstead until the telephone conversation of January 4, 1991, when she asked van der Ploeg about her fee. As the Bankruptcy Court noted, such inaction on the part of Peres is inconsistent with the existence of an agreement to split the brokerage commission. On the other hand, after the October 26, 1990 telephone conversation between Peres and van der Ploeg, Peres did inform Schinazi of the upcoming auction dates, which the Bankruptcy Court concluded Peres would have been unlikely to do in the absence of an agreement to split the brokerage commission.

Given that it was Peres's burden to prove the existence of an oral agreement by a preponderance of the evidence; that the parties presented contradictory testimony on that issue;[4] that the Bankruptcy Court had the opportunity to judge the credibility of the witnesses; and that there was substantial evidence on the record to support the Bankruptcy Court's finding that there was no oral agreement to split the brokerage commission, this Court cannot say that the Bankruptcy Court's finding that there was no oral agreement to split the brokerage commission was clearly erroneous, and will not set aside the Bankruptcy Court's finding.

■   This Court also will not set aside the Bankruptcy Court's finding that there was no agreement between Peres and Halstead to split the brokerage commission based upon the October 3 letter or the mailing card. The October 3 letter from Halstead to Schubert stated in part that "[w]e agree to actively cooperate with other brokers in the sale of your property and to split the 6% commission referred to above 50/50." Even if this statement did constitute an offer to other brokers by which Halstead intended to be bound, the Bankruptcy Court found that Halstead intended that such an offer would contemplate more of an active role on the part of the other broker than Peres played in the sale of Schubert's Townhouse to Schinazi after she learned of the terms of the October 3 letter. The Bankruptcy Court's finding is not clearly erroneous and this Court will not set it aside. As for the mailing card, while it did state "Full 6% Commission Split 50/50," the Bankruptcy Court found that it was more likely that Halstead intended this statement to constitute merely an enticement to enter into an agreement to split the brokerage commission, rather than an offer to enter into a unilateral contract whereby performance would constitute acceptance, particularly in light of the additional language in the mailing card: "For Details and Appointments call Exclusive Agent George van der Ploeg...." This

---

4. The Court notes that even if the Bankruptcy Court had nothing but uncontradicted testimony of Peres before it, a finding of no oral agreement still would not necessarily be clearly erroneous. Cf. Healey v. Chelsea Resources Ltd., 947 F.2d 611, 622 (2d Cir.1991) (Litigant's "case rested, in large part, on his own testimony. The court was not required to believe that testimony but was free to reject it as incredible.").

Court agrees with the Bankruptcy Court's conclusion.

### B. *Award of $8,100 to Peres*

Peres further contends that in light of two of the Bankruptcy Court's findings with which she does agree—that "Peres played a significant role in Schinazi's eventual purchase of the [Townhouse]" and that "[c]onversely, Halstead played a minimal role, if any, in Schinazi's purchase of the [Townhouse]"—the Bankruptcy Court abused its discretion when it awarded her only $8,100, and not the $76,050 that she sought. Once again, this Court disagrees with Peres's contention.

The Bankruptcy Court issued the October 16, 1990 retention order, which authorized the retention Halstead as the exclusive broker and auctioneer for the Townhouse. Peres subsequently applied to the Bankruptcy Court for a *nunc pro tunc* retention order; in late January 1991, the Bankruptcy Court denied Peres's application. Although Peres alleged that she was representing Schubert, the Bankruptcy Court denied her application because neither Schubert nor the Creditors' Committee supported Peres's application; furthermore, because the Bankruptcy Court had already authorized the retention of Halstead for the same purpose, the Bankruptcy Court felt that the subsequent retention of Peres would not be appropriate. Decision at 3 n. 1.

Peres now argues that, in light of the Bankruptcy Court's subsequent findings with respect to her role and Halstead's role in Schinazi's purchase of the Townhouse, (1) the Bankruptcy Court had the authority under 11 U.S.C. § 328(a) to modify the terms of the retention order and reduce Halstead's compensation, and (2) the Bankruptcy Court abused its discretion when it awarded her only $8,100. Peres's argument, however, is only half correct.

■ Under the Bankruptcy Code, the Bankruptcy Court unquestionably had the authority to reduce Halstead's compensation as provided for by the terms of the retention order. The Bankruptcy Code provides that:

Notwithstanding such terms and conditions [as provided for in a retention order entered pursuant to 11 U.S.C. § 327(a)], the court may allow compensation different from the compensation provided for under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a). The Bankruptcy Court could reasonably have found that Halstead played a minimal, if any, role in Schinazi's purchase of the Townhouse; that Halstead's minimal role was a development not capable of being anticipated in October 1990, when the Bankruptcy Court issued the retention order; and that the terms of the retention order—providing for Halstead to receive a brokerage commission of 6% of the full purchase price of the Townhouse—were improvident in light of Halstead's minimal role. The Bankruptcy Court did, therefore, have the authority to reduce Halstead's compensation by an appropriate amount. Moreover, the reduction in the amount of $8,100 was not arbitrary; it represented 6% of the additional $135,000 that the bankrupt estate realized because the Townhouse was sold to Schinazi for $2.535 million, as opposed to Azreal for $2.4 million.

■ While the Bankruptcy Court unquestionably had the authority to exercise its discretion by reducing Halstead's compensation by $8,100 pursuant to § 328(a) and ordering that the $8,100 go to the bankrupt estate as part of the proceeds of the sale of the Townhouse, it is questionable whether the Bankruptcy Court had the authority to award $8,100 (or any other sum) to Peres for professional services that she performed without having obtained the prior approval of the Bankruptcy Court. There are a number of older Second Circuit decisions that support the view that the Bankruptcy Court may not issue a *nunc pro tunc* order for the retention of a professional person. *See In re Progress Lektro Shave Corp.*, 117 F.2d 602, 604 (2d

Cir.1941); *In re H.L. Stratton, Inc.,* 51 F.2d 984, 988 (2d Cir.1931), *cert. denied,* 284 U.S. 682, 52 S.Ct. 199, 76 L.Ed. 576 (1932); *In re Rogers–Pyatt Shellac Co.,* 51 F.2d 988, 992 (2d Cir.1931); *In re Eureka Upholstering Co.,* 48 F.2d 95, 95 (2d Cir. 1931). Nonetheless, nothing in the Bankruptcy Code expressly or by necessary implication precludes the Bankruptcy Court from issuing such a *nunc pro tunc* order, and the Supreme Court has emphasized that "[t]here is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction," *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In recent years, a number of courts of appeals have found that a Bankruptcy Court may exercise its discretion and issue a *nunc pro tunc* order for the retention of a professional person, provided that extraordinary circumstances exist and that the person retained otherwise qualifies to be retained under the provisions of the Bankruptcy Code. *See, e.g., F/S Airlease II, Inc. v. Simon,* 844 F.2d 99, 105–08 (3d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *In Matter of Arkansas Co.,* 798 F.2d 645, 648–50 (3d Cir.1986); *Lavender v. Wood Law Firm,* 785 F.2d 247, 248–49 (8th Cir.1986) (per curiam); *In Matter of Triangle Chemicals, Inc.,* 697 F.2d 1280, 1289 (5th Cir.1983); *see also In Matter of Ladycliff College,* 35 B.R. 111, 113 (Bankr.S.D.N.Y.1983) ("Central to [11 U.S.C. § 327(a)] is the requirement that there must be prior court authorization for both the person and the service or the person will not be compensated. This is true even if the estate receives some benefit. The court, however, may authorize a person or service, nunc pro tunc, if to do otherwise would be unfair and inequitable.") (citation omitted); *cf.* 2 King, *Collier on Bankruptcy,* ¶ 327.02, at 327–18 (15th ed. 1992) ("Notwithstanding the equitable considerations used to justify the entry of *nunc pro tunc* orders ..., the practice is subject to question.").

■ Even if the Bankruptcy Court did have the power to enter a *nunc pro tunc* order for the retention of Peres and to award Peres a brokerage commission, however, this Court cannot say that the Bankruptcy Court's decision to award Peres $8,100 (as opposed to $76,050 or some other sum) was an abuse of discretion. As the Bankruptcy Court noted, a third party—Azreal—had signed a contract to purchase the Townhouse for $2.4 million. Because Schinazi ultimately purchased the Townhouse for $2.535 million, the bankrupt estate received the benefit of $135,000 more than it would have received had Azreal purchased the Townhouse for the contract price of $2.4 million. The Bankruptcy Court recognized that Peres played a significant role in Schinazi's purchase of the Townhouse, and thus in the realization of the additional $135,000, and it was reasonable for the Bankruptcy Court to award Peres in effect a 6% commission on the additional $135,000 that was realized due to her efforts. It was not, however, unreasonable for the Bankruptcy Court to limit Peres's award to $8,100, because if Schinazi had not purchased the Townhouse for $2.535 million, then the Townhouse could have been sold to Azreal for $2.4 million, and Peres would have been able to assert no claim to any part of the brokerage commission on the sale to Azreal.[5]

Peres has therefore not demonstrated that the Bankruptcy Court abused its discretion by not awarding her more than $8,100, and this Court will not modify the Bankruptcy Court's order to include a higher monetary award in favor of Peres.

### C. *Allegation of Bankruptcy Court Bias*

■ Peres also complains of bias on the part of the Bankruptcy Judge. Peres bas-

---

**5.** Peres also suggests that because Halstead was prepared to have the Townhouse sold to Azreal under contract for $2.4 million, yet the Townhouse was ultimately sold at auction for $2.535 million, Halstead somehow shirked its responsibility as broker and auctioneer and therefore is not entitled to $144,000 of the brokerage commission on the Townhouse. Even if Peres had standing to raise this argument, however, such an argument is properly addressed to the sound discretion of the Bankruptcy Court. The Bankruptcy Court decided to reduce Halstead's brokerage commission by $8,100, and this Court cannot say the Bankruptcy Court abused its discretion by not reducing Halstead's brokerage commission by more than $8,100.

es her claim primarily on the Bankruptcy Court's brief discussion of Halstead's allegation of a "ruse" on the part of Weisner, Ribacoff, and Peres. Halstead had alleged that (1) it was not Peres, but rather Weisner and/or Ribacoff, who introduced Schinazi to the Townhouse; (2) because neither Weisner nor Ribacoff was a broker or an attorney, Weisner and Ribacoff would have been precluded from collecting a commission on the sale of the Townhouse under N.Y.Real Prop.Law §§ 442 and 442–f; and (3) because Peres was an attorney, and therefore could collect a commission under N.Y.Real Prop.Law §§ 442 and 442–f, she acted as a "front" for Weisner and/or Ribacoff in order to obtain a commission to which neither Weisner nor Ribacoff is entitled. The Bankruptcy Court noted that while there was evidence that supported Halstead's allegation of a ruse, there was also evidence that undermined Halstead's allegation. Decision at 7–8. The Bankruptcy Court also stated that it was "convinced by the evidence that Peres did not bring others [Weisner and/or Ribacoff] 'into the fold,' but was brought into the fold herself," and while the Bankruptcy Court concluded that no violation of N.Y.Real Prop.Law § 442 had taken place, it nonetheless issued a "cautionary warning" and "admonishe[d] Peres not to violate § 442." Decision at 16 n. *.

Peres's claim of bias on the part of the Bankruptcy Court based upon its discussion of Halstead's allegation of a "ruse" is completely unfounded. The Bankruptcy Court's conclusions with respect to this issue do not appear to have played any part in its finding that Peres had failed to prove the existence of an agreement to split the brokerage commission with Halstead or its decision to award Peres $8,100 as a brokerage commission, and there is sufficient evidence on the record to support the Bankruptcy Court's finding and ultimate disposition. Moreover, Peres's claim of bias is undermined by the Bankruptcy Court's decision itself; had the Bankruptcy Court been concerned about the possibility of wrongdoing on the part of Peres, it would have been unlikely to exercise its equitable powers and award Peres any sum of money at all.

There is therefore no merit to Peres's claim of bias on the part of the Bankruptcy Court based on its discussion of Halstead's allegation of a "ruse." In addition, this Court has undertaken its own review of the decision and order of the Bankruptcy Court, as well as the transcript of the evidentiary hearing, and is convinced that the Bankruptcy Court acted in a fair and impartial manner toward both Peres and Halstead. Accordingly, Peres's claim of bias on the part of the Bankruptcy Court is rejected.

### D. *Peres's Motion for Reargument*

■ Peres also appeals from the Bankruptcy Court's order, dated July 1, 1991, denying her motion for reargument with respect to the May 14, 1991 decision and the May 16, 1991 order entered thereon.

On June 18, 1991, the Bankruptcy Court held oral argument with respect to Peres's motion for reargument. Peres did not appear at the oral argument; the Bankruptcy Court indicated that it did not need any oral argument, and read its ruling denying Peres's motion into the record. The Bankruptcy Court subsequently learned that Peres's failure to appear at the oral argument was the result not of any neglect on her part, but rather was the result of an inadvertent scheduling mix-up. The Bankruptcy Court informed Peres by letter that her presence at oral argument would not have changed its decision on the motion for reargument, and that it based its decision on the parties' motion papers and the relevant facts, *see* Letter of June 24, 1991, attached as addendum to Brief of Appellant Peres, and this is supported by the fact that the Bankruptcy Court had prepared its ruling beforehand and read it into the record.

Because Peres has not presented this Court with any reason to disturb the Bankruptcy Court's decision denying her motion for reargument, this Court will not do so.

### III. Halstead's Cross–Appeal

Halstead does not, in its cross-appeal, ask this Court to set aside the findings of the Bankruptcy Court. Rather, Halstead argues that the Bankruptcy Court abused its discretion in reducing Halstead's brokerage commission by $8,100 and awarding $8,100 to Peres, and that Peres is entitled to no brokerage commission whatsoever. Halstead's argument actually has two prongs: (1) the Bankruptcy Court abused its discretion by reducing Halstead's commission by $8,100, and (2) the Bankruptcy Court abused its discretion by awarding the $8,100 to Peres and should not have awarded Peres any sum of money. As to the first prong of Halstead's argument, this Court disagrees that the Bankruptcy Court abused its discretion in reducing Halstead's brokerage commission by $8,100. As to the second prong of Halstead's argument, this Court need not reach the merits of Halstead's position because Halstead lacks standing to raise it.

### A. *Reduction of Halstead's Brokerage Commission by $8,100*

As part of the retention order, the Bankruptcy Court approved the retention of Halstead as the exclusive broker and auctioneer for the Townhouse. The Bankruptcy Court had the power to do under the Bankruptcy Code:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). The terms of the retention order provided that Halstead would be entitled to receive a brokerage commission of 6% of the purchase price of the Townhouse. Under the Bankruptcy Code, the Bankruptcy Court also had the power to modify the compensation to which Halstead was entitled, after the performance of its services:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

Therefore, while Halstead was entitled to a brokerage commission of $152,100 (6% of the $2.535 million that Schinazi paid for the Townhouse) under the terms of the retention order, the Bankruptcy Court had the power to modify—*e.g.,* reduce—Halstead's compensation under § 328(a). In light of the Bankruptcy Court's findings that Peres played a significant role in Schinazi's purchase of the Townhouse; that Halstead played a minimal, if any, role in Schinazi's purchase of the Townhouse; and that Schinazi's purchase brought $135,000 more to the bankrupt estate than would have been realized had Azreal purchased the Townhouse under contract for $2.4 million, this Court cannot say that the Bankruptcy Court abused its discretion when it reduced Halstead's brokerage commission by $8,100. This is especially so in light of the fact that the Bankruptcy Court did not derive the $8,100 figure arbitrarily; it represents 6% of the $135,000 that would not have been brought into the bankrupt estate but for Schinazi's purchase of the Townhouse, in which Halstead played a minimal, if any, role. This Court will therefore not set aside that portion of the Bankruptcy Court's decision and order which reduced Halstead's brokerage commission by $8,100.

## B. *Award of $8,100 to Peres*

In order for Halstead to have standing to challenge the Bankruptcy Court's exercise of its discretion to award the $8,100 to Peres, Halstead "must be a person 'directly and adversely affected pecuniarily by' the challenged order of the bankruptcy court." *International Trade Administration v. Rensselaer Polytechnic Institute*, 936 F.2d 744, 747 (2d Cir.1991) (quoting *In re Cosmopolitan Aviation Corp.*, 763 F.2d 507, 513 (2d Cir.) (citations omitted), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985)).

Once the Bankruptcy Court decided, in its discretion, to reduce Halstead's brokerage commission by $8,100—which this Court has affirmed, *see* Part III(A), *supra*—the $8,100 in effect became part of the bankrupt estate.[6] The Bankruptcy Court then decided, in its discretion, to award Peres $8,100 in recognition of her substantial role in Schinazi's purchase of the Townhouse. Halstead argues on its cross-appeal that this Court should modify the Bankruptcy Court's decision by vacating the award of the $8,100 to Peres. If this Court did vacate the award to Peres, however, the $8,100 would not go to Halstead, but rather would go to the bankrupt estate. Accordingly, Halstead is not a person directly and adversely affected pecuniarily by the Bankruptcy Court's decision to award the $8,100 to Peres, and Halstead does not have standing to challenge that decision in its cross-appeal. While a party to this bankruptcy proceeding with an interest in the estate might have had standing to challenge the Bankruptcy Court's award of the $8,100 to Peres, Halstead has no such interest and therefore no standing.

Because Halstead has not demonstrated that the Bankruptcy Court's reduction of Halstead's brokerage commission by $8,100 was an abuse of discretion, and Halstead has no standing to challenge the Bankruptcy Court's award of the $8,100 to Peres,

Halstead has failed to provide this Court with any basis upon which to modify the Bankruptcy Court's decision and order.

### *Conclusion*

For the reasons stated above, the decision of the Bankruptcy Court dated May 14, 1991; the order entered thereon dated May 16, 1991; and the order denying Peres's motion for reargument, dated July 1, 1991, are affirmed in their entirety.

SO ORDERED.

---

**6.** Although the Bankruptcy Court did describe its task as "determining the rights to a pot of money," Decision at 10, this was undoubtedly a mere shorthand description of the two decisions that the Bankruptcy Court was required to make after it found that there was no agreement be-

tween Peres and Halstead to split the $152,100 brokerage commission: (1) whether to reduce Halstead's compensation, and if so, by what amount and (2) whether to award Peres a sum of money, and if so, what amount.