### In re XO COMMUNICATIONS, INC., Reorganized Debtor.

#### No. 02–12947 (AJG).

United States Bankruptcy Court, S.D. New York.

March 9, 2005.

Willkie Farr & Gallagher, by John R. Oller, Esq., New York, NY, for the Reorganized Debtor.

Debevoise & Plimpton, by Michael E Wiles, Esq., Sean Mack, Esq., New York, NY, for Houlihan Lokey Howard & Zukin Capital.

Brown Rudnick Berlack Israels LLP, by Edward S. Weisfelner, Esq., Andrew Dash, Esq., New York, NY, for High River Limited Partnership and Meadow Walk Limited Partnership.

## MEMORANDUM DECISION REGARDING OBJECTIONS TO THE APPLICATION OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

ARTHUR J. GONZALEZ, Bankruptcy Judge.

In its first and final fee application dated February 20, 2003 (the "Fee Application"), Houlihan Lokey Howard & Zukin Capital ("Houlihan") seeks final allowance of its monthly fees and expenses as approved by the Final Retention Order dated August 14, 2002 (the "Final Order") for the period June 17, 2002 through November 15, 2002. In addition, the Fee Application seeks final approval of a transaction fee (the "Trans-

action Fee") in the amount of $20 million that was not approved in the Final Order.[1]

High River Limited Partnership ("High River") and Meadow Walk Limited Partnership ("Meadow Walk" and, together with High River, the "Icahn Entities"), affiliates of Carl Icahn, along with the debtor, XO Communications, Inc. ("XO"), object to Houlihan's Fee Application arguing, inter alia, that the Transaction Fee is not "reasonable" under section 330 of title 11, United States Code (the "Bankruptcy Code").

A hearing was held and post-hearing briefs were submitted.

## I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334(b) and 157(a) of title 28, United States Code. This matter is a core proceeding within the meaning of section 157(b) of title 28, United States Code. Venue is properly before this Court, pursuant to sections 1408 and 1409 of title 28, United States Code. The following constitutes the Court's findings of fact and conclusions of law, pursuant to rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to contested matters pursuant to rule 9014 of the Bankruptcy Rules.[2]

## II. Facts

**The Parties**

XO is a holding company whose operating subsidiaries provide telecommunications services in over 20 States and the District of Columbia. XO filed its Chapter

---

1. Houlihan seeks a net payment of $18,404,182.80. This amount represents the Transaction Fee minus $2 million in pre-petition and post-petition monthly fees (as defined hereinafter) from March 15, 2002 through November 14, 2002, that were credited against the Transaction Fee (the "$2 Million Credit"). Also included in this amount are

the twenty percent holdback on monthly fees, or $400,000, and unpaid out-of-pocket expenses in the amount of $4,182.80.

2. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr.P. 7052.

11 bankruptcy petition on June 17, 2002 (the "Petition Date").

Houlihan is an investment-banking firm that engages in a number of separate lines of business, including mergers and acquisitions, financing, financial restructuring and valuations. The financial restructuring group within Houlihan includes approximately 100 professionals who provide financial advice to clients in connection with financially distressed entities.

The Icahn Entities are creditors and interested parties in this case. Several months before the Petition Date, the Icahn Entities purchased substantial quantities of senior notes issued by XO. In addition, sometime before the confirmation hearing on Plan B (as defined hereinafter) the Icahn Entities purchased approximately eighty-five percent of the senior lenders' claims against XO.

## Events Leading to XO's Engagement of Houlihan

Prior to 2002, XO and its predecessors raised approximately $2.5 billion in equity capital through offerings of two series of common stock and eight separate classes of preferred stock. XO also incurred approximately $5.7 billion in indebtedness pursuant to a senior credit facility, ten separate series of senior notes and one issue of subordinated notes.

XO, like other firms in the telecommunications business, encountered severe financial difficulties in 2001. Market valuations of telecommunications firms declined significantly and new capital or credit became difficult to locate. During 2001, XO consulted several investment banks to explore the possibilities of raising new capital, deleveraging XO's existing debt or restructuring XO's existing obligations.

In late August 2001, Houlihan contacted counsel to one of XO's principal shareholders, Forstmann Little & Co. ("Forstmann"), to discuss XO's financial situation and XO's need for restructuring services. In October 2001, Houlihan met with representatives of Forstmann, then with a few members of XO's management, and then with representatives of XO's other principal shareholder, Eagle River ("Eagle River").

## The Engagement Letter

On October 31, 2001, XO countersigned an engagement letter (the "Engagement Letter"), pursuant to which Houlihan agreed to serve as XO's restructuring financial advisor. Under the terms of the Engagement Letter, XO was to pay Houlihan a monthly fee of $250,000 (the "Monthly Fee"), reimbursement of incurred expenses and the Transaction Fee, payable upon the closing of a "Transaction."[3] The Transaction Fee was tied to the amount(s) of the various debt and preferred stock

---

**3.** The Engagement Letter provided that Houlihan would assist XO in arranging a "Transaction," which was defined as

... any transaction or series of transactions that effects material amendments to, or other material changes in, any of the Company's outstanding on-balance sheet indebtedness as of the date hereof (excluding any such indebtedness held by subsidiaries or affiliates of the Company as of the date hereof) plus accrued and accreted interest thereon (such indebtedness, with such exclusion, the "Company Debt") and/or that effects material amendments to,

or other material changes in, any of the Company's outstanding redeemable preferred stock as of the date hereof plus any accrued and accreted dividends (the "Company Preferred"), including, without limitation ... any other transaction in which the requisite consents to a reorganization or restructuring are obtained either out-of-court or pursuant to a Chapter 11 plan of reorganization or restructuring plan confirmed pursuant to Section 1129(b) of the Bankruptcy Code (collectively, a "Plan"). Engagement Letter, Houlihan Ex. 11 at 3–4.

obligations that were "restructured, modified, amended, forgiven or otherwise compromised" as part of the Transaction.

**The Restructuring Efforts**

Following the execution of the Engagement Letter, Houlihan dedicated a team of six individuals, including two of its most senior professionals and two vice-presidents, to XO's restructuring efforts. Houlihan conducted due diligence, including a detailed review of XO's financial reports and business plans. Based on the information that XO provided, Houlihan determined that XO had a $500 million "funding hole," representing the additional financing that XO would need based on XO's forecasted operating results and capital expansion plans, even without further bond interest and principal and preferred stock dividend and principal payments after December 1, 2001.

XO determined it would be in the best interests of XO's creditors as a whole if XO were to withhold certain interest payments on some of its outstanding notes that were due in early December 2001 and proceed with a restructuring of XO's notes and other obligations. XO believed that the announcement of an additional equity infusion would perhaps ameliorate the negative consequences of announcing that it would not be making the interest payments. Therefore, XO wished to identify a potential source of additional funding prior to December 2001.

XO and Houlihan narrowed a list of twenty-five possible investors to ten entities to be contacted, including Forstmann. Although a number of investors engaged in due diligence in October and November 2001, only one proposal was received: from Forstmann and a then-unidentified investor who was later identified as Telefonos de Mexico, S.A. de C.V. ("Telmex" and, together with Forstmann, the "Investors"). Within a month after XO retained Houlihan, the Investors presented a term sheet calling for a $700 million investment reflecting a pre-existing investment proposal (the "Investors' Proposal"). A week later, on November 28, 2001, the amount to be invested in XO by the Investors was increased to $800 million. Houlihan was unsuccessful in locating any other bidders to compete with the Investors' Proposal. On January 15, 2002, XO and the Investors entered into a stock purchase agreement (the "Stock Purchase Agreement").

**The Restructuring Proposals**

From January through March 2002, however, Houlihan was unable to secure the support of XO's noteholders for the proposed transaction with the Investors. On March 8, 2002, in connection with the noteholders' rejection of the Investors' Proposal, certain of the noteholders presented an alternative restructuring proposal. Three days later, this proposal was rejected by XO, in part on the advice of Houlihan.

On March 22, 2002, Chelonian Corp. ("Chelonian"), an affiliate of Carl Icahn, and the noteholders submitted a draft term sheet to XO for an alternative $500 million equity investment in XO (the "Chelonian Proposal").[4] On April 1, 2002, Chelonian revised its offer, and proposed a transaction in which $550 million would be invested in XO. Houlihan was unable to obtain the support of XO's senior secured lenders for this transaction.

At about this time, continuing declines in market valuations of companies in the telecommunications industry resulted in nu-

4. As mentioned previously, the Icahn Entities had purchased substantial quantities of senior notes.

merous bankruptcy filings related to that industry. In rapid succession, companies like Williams Communications, Flag Telecom and Global Crossing were seeking bankruptcy protection.[5] Parties looking to invest in telecommunications companies were becoming exceedingly scarce—if not already impossible to find. Unless there was a substantial change in the state of the market at that time, finding an investment proposal equivalent to the Investors' Proposal would most likely have been impossible.

Concerned about the dramatic deterioration of conditions within the telecommunications debt and equity securities market, the increasing improbability of finding other investment and the high likelihood that the closing of the Investors' Proposal would be controverted; the senior lenders, sometime in May 2002, requested that XO "prepare a modified business plan contemplating a stand-alone investment that assumed no receipt of additional third-party equity capital." At the same time, Houlihan continued an M & A process in an effort to search for other potential investors. That M & A process, not surprisingly, proved unsuccessful and Houlihan was unable to locate any other potential source of investment.

### The Chapter 11 Filing

By late May, it became apparent that the Investors' Proposal would be embroiled in litigation. In fact, on June 6, 2002, the Investors transmitted a letter to XO's counsel stating that the Investors considered it "virtually impossible" that the conditions precedent to the investment contemplated by the Investors' Proposal would ever be satisfied.

On June 17, 2002, XO commenced this Chapter 11 case. On that same day, XO filed a proposed plan of reorganization (the "First Plan") containing both "Plan A" (the reorganization predicated on the $800 million investment from the Investors) and "Plan B" (the no new value, stand-alone plan) as alternatives.

### The Retention of Houlihan

On June 17, 2002, as part of XO's "first day" motions, XO, assisted by its counsel, Willkie Farr & Gallagher ("Willkie"), filed an application seeking to retain and employ Houlihan as its financial advisor (the "Retention Application").

Objections to the Retention Application were received from all of XO's major creditor constituencies. The Official Committee of Unsecured Creditors (the "Committee") and High River each filed written objections to the Retention Application. In addition, XO's senior secured lenders under the $1 billion senior credit facility advised XO and Houlihan of their objection to the Retention Application and the terms of the Engagement Letter.

Prior to a hearing on August 13, 2002, to consider the Retention Application, that part of the Retention Application that dealt with the Transaction Fee with respect to Plan B was deferred by a stipulation (the "Stipulation") entered into among XO, the Committee, XO's senior secured lenders and Houlihan. The Stipulation approved, among other things, Houlihan's retention, XO's payment to Houlihan of the $250,000 Monthly Fee (to be credited against the Transaction Fee beginning with the payment of the Monthly Fee due on March 15, 2002 and all Monthly Fees due thereafter), and, solely in the event Plan A were confirmed by the Court and

---

5. The largest filing within the telecommunications industry, WorldCom, Inc., filed little

more than a month after XO's Petition Date.

successfully consummated, a Transaction Fee of up to $20 million. Although the reasonableness of the amount of the Transaction Fee for Plan B was to be determined by the Court at a subsequent hearing, there was no indication that XO did not continue to support Houlihan's Retention Application with respect thereto.

On August 14, 2002, consistent with the terms of the Stipulation, the Court entered the Final Order. The Final Order approved Houlihan's $250,000 Monthly Fee pursuant to section 328 of the Bankruptcy Code. A Transaction Fee of up to $20 million upon consummation of Plan A was also approved, also pursuant to section 328 of the Bankruptcy Code. However, the Final Order expressly reserved the issue of Houlihan's entitlement to the Transaction Fee if a plan other than Plan A was consummated. The hearing on the deferred part of the Retention Application that dealt with the Transaction Fee with respect to Plan B was adjourned numerous times. No order was ever entered by the Court approving a Transaction Fee for Houlihan with respect to any plan of reorganization other than Plan A.

**The Plan**

XO filed the First Plan on the Petition Date. Ten days later on June 27, 2002, XO filed its First Amended Plan of Reorganization (the "First Amended Plan") and the related disclosure statement. The First Amended Plan, similar to the First Plan, linked Plan A to Plan B in such a way that a vote in favor of Plan A was also a vote in favor of Plan B. The linkage of Plan A to Plan B allowed Plan B to proceed to confirmation in the event that Plan A was confirmed but not consummated. Another carryover from the First Plan to the First Amended Plan was the treatment of unse-

cured creditors. Pursuant to the First Amended Plan, holders of general unsecured claims were to receive different treatment depending upon whether the First Amended Plan was confirmed and consummated as it pertained to Plan A or, to Plan B. Under Plan A, each of the unsecured creditors was to receive its pro rata share of approximately $200 million (representing a projected recovery value of 8.5 cents on the dollar). Under Plan B, however, each of the unsecured creditors was only to receive its pro rata share of certain warrants and nontransferable rights (representing a projected recovery value of 1.5 cents on the dollar or less).

Several parties filed objections to the First Amended Plan's disclosure statement including, inter alia, the Committee. In its objection dated July 15, 2003 (the "Committee's Objection"), the Committee contended that the First Amended Plan was not proposed in good faith because: (i) XO had apparently failed to consider other possible alternatives to Plan A and therefore, the pursuit of Plan B, which would "essentially wipe out" unsecured claims and interests, was premature; and (ii) XO's proposal of the First Amended Plan demonstrated that it intended to fulfill its duty to the senior lenders—but at the expense of all other parties in interest.[6]

While the Committee's Objection found fault with XO's linking of Plan A to Plan B, the real crux of their objection was the treatment of unsecured creditors under Plan B.

Just four days after the Committee filed its Objection at the hearing for approval of XO's Disclosure Statement, on July 19, 2002, XO's counsel reported to the Court certain changes that would be included in

---

6. The Committee also objected, arguing that the voting procedures were inappropriate and that the information contained in the First Amended Plan's disclosure statement was inadequate.

its Third Amended Plan (the "Final Plan"), which was subsequently filed on July 23, 2002.[7] Apparently, the Committee now had XO's and the secured creditors' attention. Unlike the versions previously proposed, the Final Plan provided for a different treatment of unsecured creditors under Plan B. Now, in addition to certain warrants, unsecured creditors were to receive a "gift" from secured creditors consisting of five percent of common stock in the reorganized debtor, as well as ten percent of any recovery on XO's claims against the Investors.[8] The "gift" served its intended purpose and consequently, the Committee did not object to the Final Plan.[9]

On August 26, 2002, the Court confirmed XO's Final Plan as it pertained to Plan A. However, Plan A was never consummated. By order dated November 15, 2002, the Court confirmed the Final Plan as it pertained to Plan B. Plan B was consummated on January 16, 2003.

## XO's Withdrawal of Houlihan's Retention Application

On November 7, 2002, prior to the confirmation of Plan B, XO withdrew that portion of the Retention Application that sought approval of the Transaction Fee with respect to the consummation of a plan other than Plan A. Apparently, XO filed the Withdrawal pursuant to a certain agreement between XO and the Icahn Entities, whereby XO agreed to withdraw its

support for Houlihan's Transaction Fee if Houlihan did not accept certain settlement terms regarding its Transaction Fee request for its services pertaining to Plan B. At that time, as previously stated, the Icahn Entities owned approximately eighty-five percent of the senior secured debt and, therefore, had a significant influence over the confirmation process.

In response to XO's withdrawal of the remainder of its Retention Application, on November 13, 2002, Houlihan filed an "Objection and Reservation of Rights by Houlihan Lokey Howard & Zukin Capital With Respect to the Debtor's Withdrawal of Its Pending Application for Approval of Certain Fees Pursuant to Section 328(a) of the Bankruptcy Code." However, although Houlihan asserts that XO's withdrawal is a breach of the Engagement Letter, Houlihan is not seeking damages.

### The Fee Application

On February 20, 2003, Houlihan filed its Fee Application. In the Fee Application, Houlihan seeks approval of $19,233,333.33 in compensation (of which $18 million is the Transaction Fee), and reimbursement of $43,907.53 in expenses. Of those amounts, $833,333.33 was paid as "interim" compensation and $39,724.73 was paid as "interim" expense reimbursement. Houlihan now seeks a net additional payment from XO of $18,404,182.80 (which amount, as stated previously, represents the Trans-

---

**7.** A Second Amended Plan was filed on July 17, 2002. However, because it does not treat unsecured creditors significantly different than under the First Amended Plan, its description is not relevant to this discussion.

**8.** The recovery amounted to a $25 million settlement paid by the Investors. Therefore, an additional $2.5 million was distributed to unsecured creditors.

**9.** Excepting its filed statement (the "Statement") in which the Committee did not agree

with Plan B's characterization of distributions to unsecured creditors as a "gift." The Committee stated that because the value of XO as a reorganized debtor had not yet been determined it was not prepared to agree that actual value, or a "gift," had been given. In accordance therewith, the Committee requested that its rights to present its own valuation evidence or to object to any supplement to the Final Plan be reserved. The Committee, however, did not file any further objections to the Final Plan.

action Fee minus the $2 Million Credit, plus the twenty percent holdback of Monthly Fees of $400,000 and unpaid out-of-pocket expenses of $4,182.80).

## III. Discussion

■ A bankruptcy judge is accorded broad discretion when deciding to allow or disallow professional fees. Such decision will be affirmed unless the judge "failed to apply proper procedures or legal standards, or made factual findings that were clearly erroneous." *Elghanian v. Schachter,* 1997 WL 297035 (S.D.N.Y. June 3,1997) (citation omitted). Furthermore, a bankruptcy court's findings of fact will be accepted unless, in the rare circumstance, a reviewing court is "left with the definite and firm conviction that a mistake has been committed." *In re Schubert,* 143 B.R. 337, 341 (S.D.N.Y.1992) (citation omitted). Indeed, reversal is only justified when "there is no evidence whatsoever to sustain [the Court's] findings . . ." *Matter of Nine Associates, Inc.,* 76 B.R. 943, 944 (S.D.N.Y.1987) (citation omitted).

**Houlihan's Monthly Fees and Expenses—Section 328**[10]

■ Section 328 sets forth certain limitations on the compensation allowable to professional persons employed under section 327 of the Bankruptcy Code and restricts the grounds for modification of the original terms of an approved retention agreement. 11 U.S.C. § 328. Generally, a court may not revisit the reasonableness of a fee arrangement that has been approved pursuant to section 328. *Circle K Corp. v. Houlihan, Lokey, Howard & Zukin, Inc. (In re Circle K Corp.),* 279 F.3d 669, 671 (9th Cir.2002); *Pitrat v. Reimers (In re Reimers),* 972 F.2d 1127, 1128–1129 (9th Cir.1992).

■ Under section 328(a), a court may not revisit its prior determination as to the reasonableness of an agreement previously approved unless it determines that the terms and conditions proved to be improvident at the time they were approved in light of then-unforeseen circumstances. *In re Circle K Corp.,* 279 F.3d at 671; *In re Schubert,* 143 B.R. 337, 346 (S.D.N.Y.1992); *In re Merry–Go–Round Enters., Inc.,* 244 B.R. 327, 337 (Bankr. D.Md.2000). A finding of improvidence pursuant to section 328 is a difficult determination to make and therefore, courts rarely disturb the original terms and conditions of a professional's employment. *In re Yablon,* 136 B.R. 88, 92 (Bankr.S.D.N.Y. 1992).

■ Houlihan's Monthly Fees of $250,000 and reimbursement of expenses were expressly approved pursuant to section 328. No unanticipated developments have been raised that justify a finding of improvidence, which would allow the Court to revisit the terms of Houlihan's retention under the Final Order. Therefore, the Court finds no basis upon which it could properly conclude that the terms of Houlihan's retention were "improvident" in light of developments that were unforeseeable at the time the Final Order was entered. Accordingly, the Court will allow Houlihan's Monthly Fees and reimbursement of expenses, as set forth in the Fee Application.

**"Reasonableness" of the Transaction Fee With Respect to Plan B—Section 330**[11]

Section 330 provides that a court may allow "reasonable compensation for actual,

**10.** As stated previously, pursuant to the Final Order Houlihan's Monthly Fees and out-of-pocket expenses were approved under section 328 of the Bankruptcy Code.

**11.** As stated above, approval of the Transaction Fee with respect to any plan other than

necessary services." 11 U.S.C. § 330. Relevant factors a court should consider when determining if requested compensation is reasonable are found in section 330(a)(3):

(A) The time spent on such services;

(B) The rates charged for such services;

(C) Whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;

(D) Whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) Whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A).

■■■ Courts recognize that, given the nature of a transaction fee, certain of these "considerations drop away, such as the 'time spent' or the 'rates charged.'" *In re Intelogic Trace, Inc.,* 188 B.R. 557, 559 (Bankr.W.D.Tex.1995). In the present case, the relevant factors to consider in assessing Houlihan's request for payment of the Transaction Fee are (A) whether Houlihan's services were necessary and beneficial to the estates at the time they were rendered, and (B) whether the re-quested fee is commensurate with compensation awarded for comparable services outside of bankruptcy.

### A. Necessary and Beneficial at the Time Rendered

■■■ When determining the reasonableness of fees under section 330, courts look to whether the services provided are "services which are reasonably likely to benefit the debtor's estate." *In re Angelika Films 57th Inc.,* 227 B.R. 29, 42 (Bankr. S.D.N.Y.1998); *see also Stalnaker v. DLC, Ltd. and DLC Family Trust, Ltd. (In re DLC, Ltd.),* 295 B.R. 593, 608–09 (8th Cir. BAP 2003)(Fees may be awarded for services that are reasonably likely to benefit the debtor's estate and beneficial at the time at which the service was rendered.).

Here, with respect to Plan B, according to the documents and testimony submitted by Houlihan, it provided the following services:

1. Houlihan negotiated the terms of a reduced credit agreement with XO's Senior Lenders.

2. Houlihan negotiated the Lenders' agreement to a potential new facility that would be senior to the Senior Lenders, in the amount of $200 million.

3. Houlihan negotiated the terms and covenants to the new bank facilities.

4. Houlihan assisted with negotiations regarding the five percent common stock allocation and the terms of certain warrants that would be distributed to unsecured creditors pursuant to Plan B.

Plan A was expressly omitted from the terms of the Stipulation, as well as the Final Order that approved Houlihan's Retention Application under section 328 of the Bankruptcy Code. Accordingly, as a Transaction Fee with respect to Plan B was never approved pursu-ant to section 328, the Court finds, and the parties agree, that the Court now must determine the "reasonableness" of such Transaction Fee pursuant to section 330 of the Bankruptcy Code.

5. Houlihan assisted XO in the preparation of those portions of the Disclosure Statement that related to Plan B, including projections and recovery analyses.

6. In October and November 2002, Houlihan assisted XO in negotiations regarding various objections to confirmation and provided testimony (in the form of affidavits) in support of confirmation of the stand-alone plan.

Fee Application, Houlihan Ex. 1 at 13–14; Houlihan Post–Trial Memo. at 19–20.

Houlihan asserts that its services were instrumental in leading to the restructuring that was accomplished through XO's confirmed plan of reorganization. Houlihan further claims that it fulfilled its performance requirements and achieved the best result that could have been achieved in these circumstances. Accordingly, Houlihan argues that the services it performed were both necessary and beneficial at the time they were rendered.

In response, the Icahn Entities argue that Plan B was a disaster for everyone involved and therefore, the award of a Transaction Fee above and beyond the monthly retainer is not reasonable. The Icahn Entities claim that Houlihan failed utterly and that no logical correlation exists between the requested compensation and the benefit received. Houlihan failed to bring about the Investors' Proposal. Houlihan failed to garner the necessary support for the Chelonian Proposal. Houlihan failed to locate any other value-added financing or M & A transaction. As a result of Houlihan's repeated failures, the parties in interest were forced to resort to Plan B, which provided no new value to XO and resulted in devastating recoveries for both secured and unsecured creditors alike, as well as for equity holders.

In further support of their argument, the Icahn Entities direct the Court to the Committee's earlier objection to Houlihan's Retention Application. There, the Committee argued that the Court should not approve the Retention Application because it was already apparent that the proposed terms (including the Transaction Fee) were unreasonable. The then-proposed fees were unreasonable because they were not justified in proportion to the benefit that Houlihan had provided, would or could provide, to XO's estate and unsecured creditors.

■ Although the success or failure of services rendered may be taken into consideration when a court examines the reasonable value of such services to the estate, an unsuccessful outcome does not mandate a decision denying compensation for such services. *See In re Greene*, 138 B.R. 403, 408 (Bankr.S.D.N.Y.1992); *see also In re Webb & Knapp, Inc.*, 363 F.Supp. 423, 426 (S.D.N.Y.1973)("the failure of reorganization and the unsuccessful outcome of litigation involving issues pursued by the trustee and counsel do not bar reasonable compensation for efforts expended").

■ The record does not support a finding that the restructuring of XO's debt should be termed a "success" that would warrant the same, or even similar, Transaction Fee for Plan A as for Plan B, in view of the fact that the conditions of the marketplace were radically different when Plan A was negotiated versus when Plan B was negotiated. Plan A projected recoveries for secured creditors and unsecured creditors of 100 and 8.5 cents on the dollar, respectively. However, at the time services were rendered as to Plan B, secured creditor recoveries were to be reduced to approximately 88 cents [12] and unsecured

12. The Court notes that at or about the same time the Icahn Entities purchased the majori-

creditor recoveries were to be reduced more than 80 percent to a projected 1.5 cents or less. The services performed by Houlihan were necessary and beneficial when rendered, however, such services must be viewed in light of the services to be performed relevant to Plan B, as well as in the context of the circumstances that existed at the time of retention and not at the time the Engagement Letter was executed—some eight to ten months earlier.

Houlihan attempted to secure additional investment and was available and prepared to facilitate any investment or M & A process in the event that Houlihan's attempts had indeed proved successful. In addition, Houlihan did assist XO throughout the confirmation process. The Court is also satisfied that Houlihan played an important role in the restructuring of the secured debt.

Although, the Court concludes that Houlihan's restructuring services were necessary and beneficial with regard to the unsecured debt, the value of such services, especially regarding the unsecured debt, was substantially less at the time of retention than at the time the Engagement Letter was signed. XO's enterprise value, and hence the value of the secured and unsecured debt, were deteriorating rapidly. Furthermore, shortly after the hearing on the Retention Application, the senior secured debt holders were willing to sell at 50 cents on the dollar. To a great extent, the recoveries for unsecured creditors were more of a gift from secured creditors in return for the unsecured creditors' acquiescence to Plan B, than the product of a negotiated restructuring. Although in its Statement the Committee disagrees with the characterization of the distribution to unsecured

creditors as a "gift," the record is clear that the realities of the marketplace, coupled with the substantially reduced return for the secured creditors under Plan B, gave the unsecured creditors very little leverage. Furthermore, the oral and documentary submissions to the Court, as well as the description of the services rendered that Houlihan submitted as an exhibit to its Fee Application, simply do not support Houlihan's conclusory statements that it was instrumental in obtaining the recoveries for unsecured creditors. Accordingly, the Court finds that Houlihan has failed to meet its burden to prove that the role it played in the restructuring of XO's unsecured debt under Plan B warrants the Court's approval of the Transaction Fee as requested or at any amount similar to that which was requested.

Similarly, given XO's financial position, as well as the market for debt and equity securities of telecommunications companies at the time of Houlihan's Retention Application hearing, the Court could not have found such a retention requiring a $20 million Transaction Fee reasonable under section 328 with regard to Plan B. Services intended to restructure or bring about a "Transaction"[13] with regard to XO's unsecured debt were necessary and beneficial at that time, but not to the extent such services were when Plan A was negotiated. As already discussed, there was not a realistic likelihood of Houlihan ever locating another investment source. *See In re Phillips*, 291 B.R. 72, 80 (Bankr.S.D.Tex.2003)(services should be "relate[d] to a realistically obtainable goal").

Houlihan's efforts in the restructuring of XO's unsecured debt were beneficial and reasonable and provided some assistance

---

ty of the secured debt for approximately 50 cents on the dollar.

**13.** As defined in the Engagement Letter. *See* supra note 3.

in securing the recoveries for unsecured creditors. Further, Houlihan's due diligence may have been influential in the unsecured creditors' decision to accept the recoveries in lieu of continuing the struggle with the attendant risk thereof. Therefore, Houlihan is entitled to reasonable compensation for its efforts regarding Plan B. To determine what constitutes reasonable compensation for those efforts, the Court must determine the comparable market rate for such services in cases similar to the present case.

*B. "Market–Driven" Approach—Comparison of Fees for Comparable Services*

██ Courts in the Second Circuit have adopted a "market-driven" approach in which the cost of comparable services is a significant factor in determining reasonableness of fees. *See In re Ames Dep't Stores, Inc.,* 76 F.3d 66, 71 (2d Cir. 1996)(when it enacted section 330, Congress took "the position that 'compensation in bankruptcy matters be commensurate with the fees awarded for comparable services in non-bankruptcy cases' "); *In re Bennett Funding Group, Inc.,* 213 B.R. 234, 250 (Bankr.N.D.N.Y.1997)(courts should rely on the " 'market' of comparable legal services to assist in determining the level of compensation to be awarded").

Courts in other circuits have also stated that reasonableness is to be determined by reference to prevailing market practices. *See In re United Artists Theatre Co. v. Walton,* 315 F.3d 217, 229 (3d Cir.2003)(recognizing that section 330 "takes a 'market-driven' approach"); *Zolfo, Cooper & Co. v. Sunbeam–Oster Co., Inc.,* 50 F.3d 253, 258 (3d Cir.1995)(same); *In re Busy Beaver Building Ctrs., Inc.,* 19 F.3d 833, 853–55 (3d Cir.1994)(same); *In re Insilco Techs., Inc.,* 291 B.R. 628, 633–634

(Bankr.D.Del.2003)("we have recognized that § 330, which deals with what constitutes 'reasonable' compensation for professionals, takes a 'market-driven' approach").

██ According to Houlihan, it typically charges monthly fees and transaction fees in its restructuring engagements. In cases where it advises the Debtor, Houlihan asserts that its transaction fees usually equal one percent of the outstanding debt and preferred stock of companies with several hundred million dollars of debt, although the percentage typically declines for companies with larger total debts. After establishing that it is a customary practice, within the financial restructuring services industry, for transaction fees to equal a percentage of the face value of some or all of the debt and preferred stock in a company's capital structure, Houlihan attempts to show that the Transaction Fee, as a percentage of XO's debt, is reasonable and consistent with the practices of other comparable firms that provide financial restructuring services. According to Houlihan, transaction fees awarded in comparable telecommunications cases ranged from 24.3 basis points to 92.3 basis points as a percentage of outstanding debts, with a "mean" figure of approximately 55.5 basis points.

The Icahn Entities also identified a number of restructuring cases that they considered to be comparable to XO's case and concluded that the transaction fees in those cases averaged approximately 40 basis points.[14] The conclusions of both parties represented comparable market rates that were higher than Houlihan's Transaction Fee, which equaled 36.9 basis points, or .00369 percent of XO's outstanding debt.

**14.** The Icahn Entities' witness at the July 7, 2003 hearing confirmed this conclusion.

The Court does find that the percentage rate, which represents the ratio of the Transaction Fee to the amount of outstanding debt, appears on the surface to be within the range of reasonableness in reference to prevailing market practices.

However, the formula is flawed in a situation like the present one, where the largest portion of outstanding debt, is so far "out-of-the-money" that at best it would receive a distribution based more on nuisance value than on financial considerations. To assume that the market place would ignore that reality is not supported.[15] Furthermore, the Court has already determined that Houlihan failed to demonstrate that its assistance regarding a restructuring of any of the unsecured debt was "necessary" at the time such assistance was rendered. In addition, the Court has found that any services rendered by Houlihan with the purported intent of restructuring the unsecured debt would not have had the same market value at the time such services were rendered as similar services may have had at the time of the commencement of Houlihan's retention under the Engagement Letter. Nevertheless, Houlihan's due diligence and assistance provided some real benefit to the Debtor by helping to reduce the possibility of challenges to Plan B by minority holders of the secured debt and/or by unsecured creditors. Therefore, the reasonableness of the Transaction Fee should not be determined based upon its ratio to the total amount of outstanding debt. Instead, the reasonableness of the Transaction Fee should be determined based upon its value

as a factor of the debt that Houlihan assisted in restructuring under Plan B—the secured debt, or approximately $1 billion.

When the Transaction Fee is recalculated, now as a factor of secured debt, it represents two percent or 200 basis points—clearly outside the range of reasonableness in light of prevailing market practices, as demonstrated by both Houlihan and the Icahn Entities. Accordingly, the amount of the Transaction Fee should be reduced to reflect a reasonable value of the secured debt. Applying the lower of the two averages presented to the Court as reasonably comparable market rates, the average rate the Icahn Entities have established based upon the cases they claim are comparable to XO, 40 basis points, against the amount of the secured debt, $1 billion, the Court concludes that $4 million represents a reasonable Transaction Fee for the services rendered by Houlihan, with respect to Plan B. Under the Final Order the $2 Million Credit was to be applied toward a Transaction Fee for Plan A, however, in the Fee Application the aforementioned credit is applied to the Transaction Fee requested for Houlihan's services regarding Plan B. The record is silent as to the applicability of that credit if the Court were to approve a Transaction Fee in an amount less than the $20 million requested. However, the fact that Houlihan knew that the Court might approve a Transaction Fee in an amount less than $20 million, yet did not raise any issue as to the applicability of the $2 Million Credit to any such amount regarding Plan B, the Court finds that the $2 Million Credit

---

**15.** Indeed, at the time the postpetition services were rendered by Houlihan, the restructuring landscape was vastly different from the market conditions that were present when the Engagement Letter was executed. No evidence was submitted, nor does the Court believe that any credible evidence exists, to demonstrate that the market would have paid the $20 million Transaction Fee for restructuring services in a similar situation and in a similar market environment, where at the outset of the case it was abundantly clear that, inter alia, no financing was, or would be available, to fund a restructuring of the unsecured debt.

should also be applied to a Transaction Fee for Houlihan's services regarding Plan B. Furthermore, the Court finds that such result is reasonable in light of the entire record, including all of the facts and circumstances surrounding the restructuring of the secured debt. Accordingly, the Court approves Houlihan's Transaction Fee in the amount of $4 million, to be reduced by the $2 Million Credit. Further, the amounts already approved in this decision are to be paid as reduced by any amounts previously paid.

## IV. Conclusion

Based upon the foregoing analysis, Houlihan's monthly fees and expenses, as set forth in its Fee Application, as well as an additional transaction fee of $4 million, to be reduced by the $2 Million Credit, are hereby approved, thereby resulting in a net payment of $2,404,182.80.

XO is to settle an order consistent with this memorandum decision.