**In re XO COMMUNICATIONS, INC., Debtor.**

**No. 02 B 12947(AJG).**

United States Bankruptcy Court, S.D. New York.

Dec. 12, 2008.

Andrew L. Buck, Bragar Wexler Eagel & Morgenstern LLP, John Robert Oller, Matthew Allen Feldman, Shelley C. Chapman, Tonny K. Ho, Willkie Farr & Gallagher LLP, John J. Rapisardi, Cadwalader, Wickersham & Taft LLP, Scott J. Friedman, Jones Day, New York, NY, Patrick J. Potter, Shaw Pittman LLP, Washington, DC, for Debtors.

## OPINION, FOLLOWING REMAND, CONCERNING DETERMINATION OF TRANSACTION FEE

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The matter comes before the Court following remand by the Second Circuit Court of Appeals seeking clarification of the Court's determination, pursuant to 11 U.S.C. § 330(a), of the Transaction Fee awarded to Houlihan Lokey Howard & Zukin Capital ("Houlihan") in this case for its services as restructuring financial advisor to the debtor, XO Communications, Inc. ("XO"). The Court calculated the fee award by applying a rate of 40 basis points to the amount of the secured debt, however, no express calculation was made with respect to the unsecured debt. The ambiguity in the Court's initial ruling resulted, in large part, from inconsistent statements concerning whether the Court considered restructuring services to have been necessary with respect to the unsecured debt.

Referencing the Court's statement that services rendered by Houlihan in attempting to restructure the unsecured debt would have had a diminished value at the time rendered as measured against the purported value when Houlihan was originally engaged in October 2001, the Second Circuit questioned why the unsecured debt had been totally disregarded by not being included in the base upon which the 40 basis points were applied "especially in light of the conflicting statements concerning the necessity of the services with respect to the unsecured debt." *Houlihan Lokey Howard & Zukin Capital v. High River Ltd. Partnership (In re XO Communications Inc.)*, No. 07–2325–bk, 2008 WL 4587118 *1 (2d Cir.2008).

While requiring no particular form of analysis, the Second Circuit sought the Court's rationale for pursuing one of the following courses (i) entirely eliminating the unsecured debt from the bases upon which the fee award was calculated, (ii) applying a lower valuation to the services rendered in connection with the unsecured debt, or (iii) utilizing a different methodology or some more generalized basis for determining the value of the services rendered in connection with the unsecured debt.

### FACTS

While familiarity with the Court's prior decision and the District Court's decision on appeal is assumed, the Court will set forth certain of the more salient facts. Prior to filing for bankruptcy protection, XO attempted to secure financing. As efforts to obtain a cash infusion were unsuccessful, XO retained Houlihan on October 31, 2001, pursuant to an engagement letter (the "Engagement Letter"), as outside financial advisor to assist in exploring a variety of investment and de-leveraging alternatives, including a stand-alone re-

structuring and third-party investment scenarios. As market conditions worsened, alternatives were expanded to include restructuring and investment scenarios that could be implemented under Chapter 11.

Through the efforts of Houlihan and XO, on November 21, 2001, a term-sheet was submitted by certain investors including Forstmann Little & Co. ("Forstmann") and Telefonos de Mexico, S.A. de C.V. (together with Forstmann, the "Forstmann Investors"). On January 15, 2002, XO entered into a stock-purchase agreement with the Forstmann Investors (the "Investment Agreement"). Thereafter, discussions ensued with various constituencies, including the secured lenders, in an effort to obtain their support for the Investment Agreement. Those efforts failed and other proposals were considered by XO.

From late 2001 through the middle of 2002, the telecommunications industry was in a downward spiral. As conditions continued to worsen in that industry, those who had initially opposed the Investment Agreement came to see it as the best option available. However, for their part, the Forstmann Investors had given notice that the conditions for closing the Investment Agreement could not be met and, therefore, they were exercising their right of termination.

XO did not agree with the Forstmann Investors' position concerning termination rights but, in light of the opposition by the Forstmann Investors, XO created two alternative plans that it would attempt to implement in the following order (1) close on the Forstmann Investors Investment Agreement (which later came to be known as "Plan A") and, if that failed, (2) create a stand alone plan (which later became known as "Plan B").[1]

XO filed for bankruptcy protection on June 17, 2002 and sought to retain certain professionals, including Houlihan as financial advisor.[2] Also on June 17, 2002, XO filed its disclosure statement and plan, including the two alternatives. A hearing was scheduled for July 19, 2002 on the retention applications. XO sought to retain Houlihan pursuant to the terms of the Engagement Letter, which provided that XO was to pay Houlihan a monthly fee of $250,000 (the "Monthly Fee"), reimbursement of expenses and a transaction fee (the "Transaction Fee"), which was payable upon the occurrence of certain restructuring transactions. The Transaction Fee was to be calculated as a percentage of XO's total outstanding debt reduced by the amount of Monthly Fee payments that had been made during a certain period. On July 18, 2002, objections to Houlihan's retention were filed by High River Limited Partnership ("High River") and Meadow Walk Limited Partnership (together, with High River, the "Icahn Entities")[3] and by the Official Committee of Unsecured Cred-

---

**1.** Plan B subsequently included the damage recovery from a litigation commenced against the Forstmann Investors, a portion of which went to the unsecured creditors.

**2.** Pursuant to 11 U.S.C. § 327, professionals are retained to represent a trustee or debtor-in-possession. Also, approval of the terms and conditions of the retention is sought under section 328. Generally, the compensation to be awarded is not one of the terms and conditions sought to be approved at that stage

but is subject to the reasonableness standard under section 330, when ultimately sought. However, where a section 328 determination of the reasonableness of the compensation is sought at the retention stage, then that determination is made at that time.

**3.** The Icahn Entities held a large amount of XO's unsecured debt and later purchased approximately 85% of the secured lenders' claims against XO.

itors. In addition, the secured lenders voiced their opposition. An understanding was reached by the parties, which provided for Houlihan's retention as financial advisor under 11 U.S.C. § 328 to the extent it sought approval of the payment of Monthly Fees and expenses. In addition, the agreement provided for section 328 approval for a Transaction Fee but only with respect to Plan A. The reasonableness of a Transaction Fee with respect to Plan B was to be determined at a later date. The parties memorialized their agreement in a stipulation submitted on August 14, 2002. An order retaining Houlihan (the "Retention Order") was entered to that effect, scheduling a hearing on the remaining issue concerning the Plan B Transaction Fee for August 26, 2002, which was subsequently adjourned by consent of the parties.

On August 26, 2002, the Court confirmed XO's Plan as it pertained to Plan A.[4] That plan, however, was never consummated. Thereafter, on November 15, 2002, the Court confirmed Plan B, which was consummated on January 16, 2003. On November 7, 2002, XO, the proponent of Houlihan's retention, filed a notice of its withdrawal (the "Notice of Withdrawal") of that portion of Houlihan's retention application not yet ruled upon by the Court, i.e., the Transaction Fee regarding Plan B.[5] On November 13, 2002, Houlihan filed an objection to the Notice of Withdrawal and asserted that while Houlihan had no procedural right to bar XO's action in that regard, the withdrawal was, nevertheless, a breach of the Engagement Letter. Fur-

ther, Houlihan requested that the Court set a hearing for its fees and contended that any objection to its fee request should be subject to a section 328 standard of review.

On February 20, 2003, Houlihan filed its First and Final Application for the Allowance of Compensation and Reimbursement of Expenses (the "Fee Application") seeking, among other relief, $18 million, representing the $20 million Transaction Fee less the approximately $2 million in Monthly Fees already paid. The Icahn Entities filed an objection to the Fee Application and XO joined in that objection.[6] The Court conducted a hearing on June 13, 16 and July 7, 2003. The Court found that because a Transaction Fee with respect to Plan B had not been approved pursuant to section 328, the "reasonableness" of the Transaction Fee had to be determined pursuant to section 330.

On March 9, 2005, the Court issued its ruling, *In re XO Communications Inc.*, 323 B.R. 330 (Bankr.S.D.N.Y.2005), determining that, pursuant to section 330 of the Bankruptcy Code, $4 million represented a reasonable Transaction Fee for the services rendered by Houlihan with respect to Plan B. The amount was calculated by applying 40 basis points against the amount of the $1 billion secured debt. There was no indication in the Court's ruling that any of the amount was attributable to the unsecured debt. In addition, because the Retention Order incorporated that part of the Engagement Letter that required that a credit, representing the Monthly Fee payments received by Houli-

---

4. The voting on the plans resulted in approval by all classes for Plan A, but Plan B was rejected by both of the unsecured classes and was accepted by the secured lenders' class who were impaired under that plan. Therefore, the confirmation of Plan B resulted from a "cramdown" under section 1129(b).

5. By this time the Icahn entities had significant influence over XO and the confirmation process because of their ownership of 85% of the secured debt.

6. As noted, by that time, XO was controlled by the Icahn Entities.

han, be applied to an award of a Transaction Fee, the Court reduced the $4 million award by the $2 million in Monthly Fees paid during the relevant period. An order to that effect was issued on March 21, 2005 (the "March 21, 2005 Order"). Houlihan filed a motion for reconsideration on March 31, 2005, which the Court denied by order entered on May 13, 2005. Houlihan appealed and in an opinion dated April 25, 2007, *Houlihan Lokey Howard & Zukin Capital v. High River Ltd. Partnership*, 369 B.R. 111 (S.D.N.Y.2007), the District Court for the Southern District of New York affirmed the Court's ruling. A judgment to that effect was entered on June 1, 2007. Houlihan appealed the District Court's judgment to the Second Circuit and the matter has been remanded for clarification concerning the bankruptcy court's March 9, 2005 ruling.

## DISCUSSION

Some background is necessary to put the Court's analysis in context. Typically, in retaining a financial advisor outside of bankruptcy, an engagement is entered into in which the financial advisor's compensation includes a monthly retainer and a transaction fee paid after a successful restructuring is concluded. The purpose of the monthly retainer is to ensure that a financial advisor receive some compensation for its efforts in case the transaction is never consummated. The restructuring fee is a percentage of the value of some or all of the debt to be restructured. In that regard, the market places value on the results that may be brought about by the professional. At the outset of the engagement, the agreement is formulated from a prospective viewpoint and, subsequently, there is no "look back" to examine the reasonableness of the compensation in the context of the nexus between the effort expended by the financial advisor and the culmination of the transaction. Thus, once

the transaction is concluded, the financial advisor is entitled to the transaction fee whether it substantially contributed to the restructuring of certain components of debt or whether its efforts had little effect in accomplishing the restructuring.

The consummation of a transaction is inherent in the fee arrangement and if no transaction is concluded, no transaction fee is paid. When the parties to an engagement negotiate the restructuring fee, they assess the value of future services to be provided by the financial advisor. They take into consideration what is to be accomplished, the degree of difficulty of the task and the skill of the professional retained. Each side assumes the attendant risk of setting the reasonableness at this prospective stage. If it turns out that the financial advisor had no real impact on the transaction, the retaining entity may have overpaid for the services rendered. In the same way, if the financial advisor expends far more of its resources than initially anticipated in bringing about the desired result, the financial advisor may have been under-compensated for the services it provided.

■ Once in bankruptcy, the same prospective analysis usually applies if the financial advisor's compensation is sought to be approved under 11 U.S.C. § 328 at the outset of its actual engagement. A determination of reasonableness is made at the time of retention based upon the available information. Pursuant to section 328, a court is asked to approve the reasonableness of a transaction fee arrangement based upon the financial advisor accomplishing a certain goal. Further, after the reasonableness prong is determined, there is no opportunity to revisit that determination unless it proves "improvident in light of developments not capable of being anticipated at the time of the fixing of such

terms and conditions." 11 U.S.C. § 328(a). That is a very difficult standard to meet and it is not often that these fee arrangements are adjusted. *In re XO Communications, Inc.*, 323 B.R. 330, 339 (Bankr. S.D.N.Y.2005) (citation omitted). The section 328 retention is similar to the pre-petition prospective approach to setting compensation, in that the court reviews the terms and conditions of compensation to see if they are reasonable from a prospective viewpoint. Thus, whether retained *outside of bankruptcy or under a section 328* prospective analysis, the typical engagement would preclude an examination of, among other things, the impact the financial advisor had in bringing about the transaction; and the parties agree to assume the attendant risks involved as to the potential for underpayment or overpayment for the services rendered.

█ Generally, when a debtor seeks to retain a financial advisor to assist in a chapter 11 restructuring, there is not a large gap between the time of entering into the engagement agreement and the time of the retention hearing before the bankruptcy court. However, in a prepackaged bankruptcy case, much of the restructuring effort occurs prior to the filing. Therefore, by the time of the retention hearing, there are few unknown facts remaining concerning the financial advisor's contribution to the transaction. Often, the only major unknown component is whether the transaction will occur, thereby triggering the transaction fee. Nevertheless, it is the facts, as known at the time of the retention hearing, that are considered by the court in determining whether the terms and conditions of the engagement are reasonable. Neither the court nor the parties are limited to only considering the facts as they existed at the time of the engagement, which may have been entered into several months earlier.[7] Thus, there is less that the parties have to view from a prospective basis in arriving at a determination of the reasonableness of the consideration to be paid.

The Court previously noted that although an unsuccessful result does not automatically require a denial of compensation, the fact that the service rendered was unsuccessful may be considered when ascertaining the value of the service. *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 42 (Bankr.S.D.N.Y.1998). Moreover, the analysis which declines to mandate disallowance of fees in the absence of a successful result applies more in the context where a professional is charging hourly legal fees in the expectation of a beneficial result without a certainty of such result. In those cases, the court examines whether the hourly work performed was beneficial when rendered, that is, whether there was a reasonable expectation at the time that the service is performed that such work might lead to a beneficial result. Under that analysis, reasonable compensation may be awarded regardless of whether there was a successful outcome to the endeavor.

█ In the context of a transaction fee or success fee,[8] however, a successful re-

---

7. It is the debtor-in-possession and not the pre-petition entity (who entered into the engagement) that is seeking the retention. Moreover, the court is not determining whether it was reasonable for the entity to have agreed to the terms and conditions in the pre-petition engagement but whether it is reasonable for the debtor-in-possession to subject the estate to those terms and conditions.

8. To the extent that a "success" fee would be earned upon achieving a stated goal, it is similar to—if not the same as—a transaction fee triggered by the closing of a transaction. Both the transaction fee and the success fee are distinguishable from a "bonus" or "fee

sult is inherent in the fee structure. Any engagement agreement would typically require that there must be a successful result before the fee may be sought. Hence, in the context of a financial restructuring, the debt being restructured is usually a condition precedent to any right to request a transaction fee. Further, if the restructuring occurs, unless the entity obtained approval under section 328 as to the reasonableness of the compensation sought for the engagement, the reasonableness of the professional's compensation is evaluated under section 330.

■ Where the services rendered are reviewed under 11 U.S.C. § 330(a), the court may allow "reasonable compensation for actual necessary services." This analysis is also market driven, however, it is no longer from a prospective view point. For the court examines the reasonableness based upon the facts that existed when the services were rendered. Moreover, the court may "award compensation that is less than the amount of compensation that is requested." 11 U.S.C. § 330(a)(2). In determining the amount of reasonable compensation to be awarded to such professional person, section 330(a)(2) provides that "the court shall consider the nature, the extent, and the value of such services." The factors considered in making the determination include—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at

the time at which the service was rendered toward the completion of a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(2).

■ In considering a transaction fee, courts recognize that certain of these factors do not apply, such as "time spent" [9] or the "rates charged." *In re Intelogic Trace, Inc.*, 188 B.R. 557, 559 (Bankr. W.D.Tex.1995). Rather, relevant factors to consider in assessing a financial advisor's transaction fee are (i) whether the financial advisor's services were necessary and beneficial to the estates at the time they were rendered, and (ii) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases outside of bankruptcy.

■ When a court conducts a section 330 review of fees that only are compensable if a specific result is achieved, it must

---

enhancement," the latter two of which are paid if, through the efforts of a particular professional, some "rare and extraordinary" result is achieved that would warrant an upward departure from the agreed upon or standard compensation. *See Blum v. Stenson*, 465 U.S. 886, 898–902, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (discussing, in the context of a civil rights case, the standard for an

upward adjustment from the prevailing market rates for attorney fees).

9. Under a section 330 examination, the time spent may shed little light on the actual value that a financial advisor brought to a transaction, it is more the financial advisor's access to market opportunities and the results it achieved that warrant its compensation.

find that the work was beneficial when rendered and of necessity must look to the nexus between the work done and the results achieved. Thus, unlike the typical section 328 situation where the tasks to be performed and the results to be achieved are examined prospectively[10]—because usually neither the tasks nor the results have occurred at that stage, the "reasonable standard" of section 330 allows a court to view, on an ongoing basis, the nexus between the tasks performed and the results achieved.

■ Houlihan argues that the Court cannot examine that relationship and, in effect, that the Court's analysis must determine whether at the time of the engagement the fees sought were reasonable. The Court disagrees and concludes that, at the time of the analysis, the Court examines the reasonableness of the services as those services were performed and their impact on the outcome in attempting to achieve the desired goal. Moreover, even if the hearing to consider Houlihan's retention, under section 328, concerning Plan B had gone forward on the originally scheduled date in July 2002, or any date thereafter, the Court would have examined the facts as known at the time of any hearing on that issue. Thus, by then, the analysis under section 328 would have included consideration of facts known more than eight months after the terms and conditions in the October 31, 2001 Engagement Letter were agreed to by the pre-petition entity. Therefore, as more of the relevant facts, including the outcome of certain efforts become known prior to the section 328 hearing—and less needs to be viewed prospectively, the section 328 analysis as to

whether the terms and conditions of compensation are reasonable merges into the section 330 analytical structure concerning reasonableness.

When Houlihan's retention was presented to the Court, the agreement as related to Plan A reflected the marketplace process for a plan that was formulated based upon the market conditions before the downturn in the telecommunications industry. There were no issues raised about the reasonableness of applying approximately 35 basis points.[11] In fact, by the time the Court approved Houlihan's retention as related to Plan A, virtually all of the work required of Houlihan to effect that plan had been completed. Therefore, the parties had the benefit of knowing what Houlihan's contribution would be with respect to the results that would obtain if Plan A were consummated. In that regard, Houlihan's retention with respect to Plan A was not a true prospective analysis because the parties had the benefit of knowing the impact of Houlihan's efforts toward those results. The only remaining issue was whether Plan A would be confirmed and consummated. Nevertheless, by obtaining a section 328 retention for the Transaction Fee for Plan A, further examination of the reasonableness of that fee—but for the "improvident standard"—was foreclosed.

With respect to Plan B, however, there was a great deal of resistance raised by all of the major constituencies concerning a section 328 approval of the Transaction Fee in light of the status of the case at that time. Those objecting to the section 328 approval of the "reasonableness" of

---

10. Often there is resistance to a section 328 determination of the reasonableness of a fee where a dispute exists as to the value of the services that are to be rendered.

11. That figure is based upon the relationship of a $20 million Transaction Fee to $5.7 billion of total debt. The terms of the Engagement Letter required a $25 million Transaction Fee, but Houlihan agreed to reduce that amount to $20 million.

the Plan B Transaction Fee challenged, among other things, whether a financial advisor could bring any value to the estate regarding the unsecured debt structuring under that plan. Instead of having the Court rule on that issue at that time, Houlihan agreed to defer the "reasonableness" issue, under section 328, as to the Transaction Fee and to have it considered later. Further, at the time that Plan B was formulated, it represented the "harsh" realities of the telecommunications industry.

Houlihan's Monthly Fees of $250,000 and reimbursement of expenses were expressly approved pursuant to section 328. Inasmuch as no unanticipated developments were raised that justified a finding of improvidence, those fees and expenses, as set forth in the fee application, were allowed. Houlihan's approach to its Transaction Fee, as previously mentioned, seeks to have its retention concerning Plan B effectively reviewed based upon what was known at the time of the engagement and to ignore conditions of the case and marketplace at the time the Court considered the reasonableness of its compensation, whether under section 328 or section 330.[12]

Houlihan argues that because the Second Circuit applies a market-driven approach to assessing the reasonableness of fees under section 330, that approach requires that the fees agreed to in the engagement apply. Houlihan's view seems to be that regardless of when the "reasonableness" analysis comes before the Court, the only facts considered are those that were known at the time the parties initially entered into the engagement. Thus, according to Houlihan, the Court should apply a prospective analysis as of the time of the engagement and ignore additional facts that have become known by the time retention is sought. This is not how either section 328 or section 330 are applied.

While section 328 prevents a "look back" once the "reasonableness" determination has been made, it does not limit the "reasonableness" determination to the facts as they were known at the time of the pre-petition engagement, nor would this be the approach under section 330. At the time of the section 328 hearing, the court's "reasonableness" determination is based upon the record before it at the time. The court is not asked to ignore those events that may have taken place during the period between the initial engagement and the bankruptcy filing.[13]

In arguing that the Court should ignore this information, Houlihan is, essentially, arguing that the marketplace would ignore it. There is no basis to believe that if the marketplace were to determine the reasonableness of compensation for a transaction fee after much or all of the financial services had been performed, that the marketplace would ignore that information. The marketplace only speculates on what it cannot discover with certainty.

As previously stated, under section 328, many of those facts are not known and therefore, the reasonableness of the terms and conditions is determined from a prospective view. Nevertheless, the Court

---

12. By the time the section 328 retention was first presented to the Court in mid–2002, the environment within which any restructuring could take place was totally different from that existing in October 2001 because the industry downturn radically changed the dynamics of the case and any restructuring prospects.

13. To the extent that the terms and conditions of a professional's pre-petition agreement are not approved by a court, a professional can decide to accept the terms and conditions that the court deems reasonable or decline the engagement and assert whatever rights it may have by virtue of any pre-petition agreement with the debtor.

examines the reasonableness of the terms and conditions at the time of retention. To argue that the marketplace would focus on conditions present several months earlier, in a dramatically changing industry, to determine the terms upon which it would retain a professional is to describe a completely inefficient, dysfunctional marketplace, which would not be an appropriate measure of reasonableness under any analysis.[14]

In its prior decision, the Court referenced XO's financial position and the market for debt and equity securities of telecommunication companies at the time of Houlihan's retention application hearing, as well as the resistance by all major constituencies regarding the reasonableness of a section 328 prospective-based retention because of the status of the case at that time. In view of these considerations, the Court surmised that it would not have found a retention requiring a $20 million transaction fee reasonable under section 328 with regard to Plan B. Thus, at the time the debtor sought to retain Houlihan, it does not appear that the marketplace would have agreed to a $20 million Transaction Fee for Plan B.

The market-driven approach applied in the Second Circuit determines if fees are reasonable by reference to prevailing market practice in which the cost of comparable services plays a significant role. *XO*, 323 at 343 (citations omitted). In determining the reasonableness of a transaction or success fee, in the absence of an actual determination prior to or at the time that the services were rendered of what the marketplace would bear, the court must look at the nexus between what was achieved, *i.e.*, the restructuring of the debt, and the impact of the advisor's effort in that regard.

Moreover, the market-driven approach considers what value the marketplace would attribute to the work when rendered. As previously noted, by the time Houlihan was retained, because it had already completed most of the work required with respect to Plan A, the parties were aware of the extent of Houlihan's efforts required for that engagement. Therefore, by the time of the retention, the parties were not speculating as to the work required of Houlihan. They knew Houlihan's contribution to Plan A and supported the Plan A Transaction Fee in that context.

Although the Court said that it was reasonable for Houlihan to assist XO in its effort to restructure the unsecured debt, Houlihan failed to establish the relationship between its assistance and the actual restructuring of that debt because the unsecured debt was "out of the money." Houlihan had little discernable impact on that effort. The only impact it had is that, perhaps, it assisted in convincing some disgruntled creditors that this was the only result they could attain. In addition, it assisted in the confirmation process. Thus, the Court looks to what was reasonable compensation for that work.

Indeed, at the time of the bankruptcy retention, it is apparent from all of the opposition from the major constituencies that the marketplace would not ignore the reality of the circumstances present at that time. It was already evident that no fi-

---

14. Thus, even if the section 328 retention hearing had gone forward in July 2002, or any time before the Notice of Withdrawal, in the context of addressing the issues raised by the various parties' opposition to the retention, the Court would have considered the true market-driven value of the services at the time by making its determination based upon the factors that existed then, not those that existed at the time of the engagement in October 2001.

nancing was, or would be available, to fund a restructuring of the unsecured debt which was far enough "out of the money" that the only recovery would be a "gift" from the secured creditors to facilitate the confirmation process.

While the Court made certain inconsistent statements about the necessity of the work performed by Houlihan in regard to the unsecured debt, the Court did clearly state that Houlihan played an important role in the restructuring of the secured debt. In that regard, the Court awarded Houlihan a $4 million Transaction Fee based upon applying 40 basis points against the $1 billion secured debt. Upon reflection, it is not clear to the Court whether it intended to apply a lower rate (similar to the 35 basis points that would have applied to a restructuring under Plan A) to the secured debt and then raised it to 40 basis points to compensate Houlihan for its limited assistance in regard to the unsecured debt.[15] Therefore, the Court cannot conclude that it allocated any portion of the 40 basis points to Houlihan's efforts with respect to the unsecured debt.

■ With respect to the necessity of Houlihan's services when rendered in regard to the unsecured debt, the Court, at one point, indicated that Houlihan had failed to show that its assistance regarding the restructuring of any of the unsecured debt was necessary and at other times indicated that Houlihan had performed services necessary with regard to the unsecured debt, albeit of a lesser value than expected at the time of the engagement. The Court believed, but failed to articulate, that it was reasonable and necessary to retain Houlihan, however, once the results were known, Houlihan did not show that its efforts brought about those results. Inasmuch as the completion of

the transaction was necessary to request the Transaction Fee, Houlihan's impact in bringing about that transaction is relevant to any determination of reasonableness under section 330. Whereas, under a section 328 prospective analysis, the financial advisor's impact in bringing about the result is assumed.

In calculating any type of award offered as an incentive to produce a certain result, "the measure of success is certainly not precise." *See In re Enron Corp., et al.,* Case No. 01–16034, 2006 WL 1030421 *7 (Bankr.S.D.N.Y. April 12, 2006) (analyzing measure of award under section 330 reasonableness standard for payment of a success fee to a restructuring officer). Several circuits have turned to the lodestar method and calculated the number of hours worked and rates charged as compared to similar professionals. *See Houlihan Lokey Howard and Zukin Capital v. Unsecured Liquidating Trust (In re Commercial Financial Services, Inc.),* 427 F.3d 804, 815 (10th Cir.2005) (approving bankruptcy court's evaluation of reasonableness of financial advisor's compensation based upon lodestar method, calculating number of hours worked and rates charged in comparison to other financial advisors working in the same proceeding). *See also In re Citation Corp.,* 493 F.3d 1313, 1320–21 (11th Cir.2007) (approving use of adjusted lodestar analysis as one method to determine reasonableness of fees charged for financial advisory and investment banking services).

The Court does not subscribe to the lodestar method as the most reliable method for evaluating a financial advisor's entitlement to a transaction or success fee. In the marketplace, any such fee is usually awarded in addition to monthly compensa-

---

**15.** An additional 5 basis points allocated to the secured debt was the equivalent of ap-

proximately 1 basis point of the unsecured debt.

tion and, in the context of a financial advisor, the fee is intended to act as an incentive for the professional to obtain a certain result. Cf. *See Enron Corp.*, 2006 WL 1030421 at *6 (noting that in the context of a CEO or top management, "a success component operates as an incentive to enhance value for the benefit of the enterprise"). As long as the marketplace perceives that the professional will be a major force contributing to achieving the goal, the marketplace does not concern itself with the amount of time spent by the professional to reach that goal.[16]

In the prospective analysis, the "prevailing market practice" is to set a transaction fee based upon the marketplace perception of whether the services and expertise of the financial advisor will bring about the transaction. If the marketplace, however, is called upon to determine the reasonableness of a transaction fee as the services are rendered and their impact becomes known, the marketplace would then determine the compensation based upon the value that the services had in achieving the result. There is no reason to believe that where the prevailing-market practice of setting the transaction fee on a prospective basis does not occur, the marketplace would not evaluate a transaction fee based upon all known data, including the impact of the financial advisor's effort in bringing about the result.

With respect to the necessity of Houlihan's services in regard to Plan B, certain parties with a significant financial stake in the outcome of the case, as well as the Creditors' Committee, were objecting to Houlihan's retention regarding the Transaction Fee. The parties' objections raised significant doubt as to whether Houlihan's efforts would have any impact on the ultimate treatment of the unsecured debt. Thereafter, when the Court found that it was necessary for Houlihan to be engaged in that process, it recognized that Houlihan's contribution might be marginal. Although Houlihan may have assisted in the confirmation process of Plan B by attending various meetings regarding the issuance of warrants, aiding XO in its disclosure statement, and participating in the confirmation hearing, there is no evidence that Houlihan played a significant role in bringing about the restructuring of the unsecured debt. At the time that the Court permitted Houlihan to remain in the process, it may well have been the case that, outside of bankruptcy, the marketplace would have directed Houlihan to concentrate its efforts on the secured debt.

■ In its March 9, 2005 opinion, the Court did not award Houlihan any portion of the Transaction Fee related to its minimal contribution with respect the unsecured debt under Plan B. Taking into consideration the services rendered by Houlihan concerning Plan B, the Court should have provided some compensation for those efforts, especially in light of the fact that the $2 million in Monthly Fees awarded for compensation were fully credited against the amount for the secured debt, thereby eliminating any consideration to Houlihan that could be attributable to the restructuring of the unsecured debt.

---

**16.** Thus, if you have a firm employing an investment advisor with facile access to the capital markets, who is able to complete a transaction after making a targeted, effective commitment of resources, that firm would make the same transaction fee as another firm whose negotiation might result in concluding the same transaction but only after its personnel have expended hundreds of hours over several months to make the arrangements. It is the bringing about of the result that is central to the financial advisor's compensation. The amount of time spent is not likely to provide much insight into the value provided by the financial advisor.

Under the circumstances, taking into consideration (i) the degree of difficulty that existed with respect to the restructuring of the unsecured debt; (ii) Houlihan's contribution to that process, including its assistance to XO in various phases of the confirmation process; and (iii) Houlihan's commitment of resources, the Court finds that an award of $1 million is reasonable under the circumstances. The $1 million allowance represents approximately 2 basis points of the unsecured debt restructured. On a composite basis, the new awarded total of $5 million is approximately 9 basis points of the entire $5.7 of secured and unsecured debt restructured. Considering that this is 25% of the Plan A Transaction Fee, and recognizing the vast difference in Houlihan's contribution regarding the restructuring for Plan A versus Plan B, the "reasonableness" of the award is further supported.[17]

In addition, the Court recognizes that 9 basis points for the entire debt falls below the ranges submitted by the parties for a composite basis-point award. However, in reviewing the various retention orders for the cases listed on Exhibit H,[18] submitted by Houlihan as part of its fee application,

the transaction fees at issue in the listed cases were approved under section 328 at the outset of each case. Thus, there would have been no section 330 "reasonableness" analysis done as to the actual impact that the particular financial advisor had on restructuring. The courts in those cases had before them whatever facts were available to the parties at the outset in each case, which formed the bases upon which the "reasonableness" finding under section 328 was made. As a result, those examples do not reflect the circumstances of the instant matter where the review includes the knowledge of what was done by the financial advisor and its impact on the case. Rather, those cases reflect the section 328 prospective analysis and the attendant risks assumed therein, discussed previously.

### CONCLUSION

Based upon the foregoing, the Court concludes that, with respect to the Transaction Fee, Houlihan should be awarded an additional $1 million as consideration attributable to the restructuring of the unsecured debt, which sum is to be added to the amount of the Transaction Fee origi-

17. The Engagement Letter shows that different basis-point values are assigned to different types and amounts of debt. Under the Engagement Letter, the agreed upon allocation of basis points to the secured debt was 10 basis points. As a result of the circumstances in the industry, including the rapidly declining value of XO, the Court in its determination set the value of Houlihan's efforts regarding that debt at 40 basis points.

Houlihan has argued that had it been retained only to restructure the secured debt, the fee would have been in the range of 70–90 basis points. Converting the basis points into dollars, under the Engagement Letter, at 10 basis points, Houlihan was willing to accept $1,000,000 for restructuring the secured debt as part of the $25,000,000 Transaction Fee. However, if it had been retained only to restructure the secured debt in the 70–90 basis-

points range, it argues that then its market-based transaction fee would have been between $7,000,000 and $9,000,000. Some of the discrepancy between the amounts certainly can be attributed to the singular-debt retention versus the total-debt retention, and the size of the engagement. However, other factors, including the importance and difficulty in restructuring a particular debt, have influence over pricing as well. Also, changes in the industry and financial markets impact the factors that affect pricing. Therefore, circumstances surrounding XO in October 2001 as compared to those in mid–2002 would have resulted in a very different cost structure for the engagement.

18. Exhibit H provides a list of nine restructuring fees in Chapter 11 bankruptcy cases that includes a range of basis points between 21.6 and 85.0, with a mean of 53.3.

nally awarded in the March 21, 2005 Order.

A contemporaneous Order to this effect will be entered.